IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BUD MINTON, | No. C 08-1941 CW |
|     Plaintiff, | ORDER GRANTING PLAINTIFF'S MOTION FOR JUDGMENT AND DENYING DEFENDANT'S CROSS-MOTION FOR JUDGMENT |
|   v. | |
| DELOITTE AND TOUCHE USA LLP PLAN, | |
|     Defendant. | |

Plaintiff Bud Minton moves for judgment on the administrative record on his claim for long-term disability benefits under the Employee Retirement Income Security Act (ERISA). Defendant Deloitte and Touche USA LLP Plan cross-moves for judgment on the administrative record. The matter was heard on February 19, 2009. Having considered oral argument and all of the materials submitted by the parties, the Court grants Plaintiff's motion and denies Defendant's cross-motion.

## FINDINGS OF FACT

Plaintiff formerly worked as a graphics designer for Deloitte and Touche. His duties were primarily sedentary and involved large amounts of time spent working at a computer.

Deloitte and Touche maintains a long-term disability plan for its employees. Metropolitan Life Insurance Company (MetLife) both serves as the Plan's claims administrator and funds benefits that are paid under it. The Plan provides benefits for employees who

are "totally disabled" based on the following definition:

> During the 90-day benefit waiting period before your benefits begin and during the remainder of the first 24 months that you will be receiving benefits, total disability means that you are completely unable to perform the duties of your regular job. After you have received disability benefits for 24 months, you will be considered totally disabled only if you are completely unable to perform any occupation for which you are reasonably qualified by education, training, or experience.

Administrative Record (R.) at 39. The Plan gives MetLife "discretionary authority to interpret the terms of the Plan and to determine eligibility for and entitlement to Plan benefits in accordance with the terms of the Plan." R. at 51.

After nine years of employment with Deloitte and Touche, Plaintiff began experiencing pain in his arms, upper back and neck due to extended periods of on-the-job computer use. He took approximately ten months off work in 2001 and 2002 while he underwent physical therapy. He returned to work in July, 2002 and reduced the amount of time he spent at the computer. In July, 2006, Plaintiff's job duties were changed and he was required to spend more time working on the computer, which worsened his pain. In August, 2006, he was given the choice of either becoming a graphics coordinator, which would have entailed even more time at the computer, or accepting a severance package and the termination of his employment. Although the record on this point is not clear, Plaintiff apparently decided, with his employer's consent, to take some time off to recover, and he stopped working the next day. It is not clear whether he advised Deloitte and Touche that he intended to return to serve as a graphics coordinator once he

2

recovered, but it does not appear that his employment was officially terminated. In any event, he never returned to work and, in December, 2006, he submitted a claim for long term disability benefits.

In support of his claim, Plaintiff submitted a statement from his attending physician, Dr. Hill. Dr. Hill stated that Plaintiff had been diagnosed with fibromyalgia, a condition marked by chronic soft tissue pain,[1] and with depression. He opined that, although Plaintiff could sit, stand and walk continuously for up to eight hours, he was unable to spend more than two hours per day at the computer.

On February 7, 2007, a representative of MetLife called Plaintiff and informed him that his claim was going to be denied. Plaintiff requested that the decision be delayed so that he could submit additional medical records from Dr. Hill. MetLife agreed, and Dr. Hill provided a one-page note based on an office visit Plaintiff made on February 13. The note stated that an exam revealed no new objective findings with respect to Plaintiff's condition. Dr. Hill remarked that Plaintiff's chronic soft tissue pain was improving with treatment, but that in his opinion, Plaintiff should not return to work until at least May 15. R. at 450.

MetLife provided Plaintiff's claim file to Dr. Nisenfeld, a board-certified orthopedic surgeon, for review. Dr. Nisenfeld

---

[1] Dr. Hill's diagnosis was "soft tissue pain," but the diagnostic code he used corresponded to a diagnosis of fibromyalgia. R. at 473. The two terms appear to be used interchangeably.

3

opined that Plaintiff was not "so physically impaired from fibromyalgia that he is unable to do his sedentary job functions which require computer/phone work from 08-2006 to the present time." R. at 445. In support of his opinion, Dr. Nisenfeld noted:

> In the treatment notes of Dr. Hill that were reviewed there is no documentation of any musculoskeletal abnormality that would cause any functional limitation. Essentially the notes reflect the claimants [sic] complains [sic] of pain in many bodily areas and the [attending physician] is giving supportive therapies to these areas. No diagnostics were carried out nor reported on for this claimant.

R. at 446.

MetLife sent Plaintiff a letter on March 12, 2007 notifying him that his claim had been denied. In explaining its decision, it repeated Dr. Nisenfeld's findings and concluded, "Although office notes indicate your ongoing complaints of pain, there are no clinical or diagnostic findings that substantiate restrictions and limitations or an impairment of such severity that would prevent you from performing your job." R. at 447.

Plaintiff appealed MetLife's decision. As part of its review on appeal, MetLife submitted Plaintiff's file to a board-certified rheumatologist, Dr. Payne.[2] Dr. Payne reviewed Plaintiff's medical records and spoke with Dr. Hill before coming to the conclusion that Plaintiff was not disabled. Dr. Payne acknowledged Plaintiff's reports of pain and noted that Dr. Hill's "workup has been quite appropriate and extensive and with negative findings."

---

[2]MetLife also sought the opinion of a board-certified psychiatrist, Dr. Goldman, who concluded that there was no evidence of a psychiatric disability. Plaintiff apparently does not dispute Dr. Goldman's opinion that his depression is not disabling.

4

R. at 136. He did not dispute Dr. Hill's diagnosis of fibromyalgia, but stated that, "from a rheumatology viewpoint," there were no "objective findings that would necessitate the placement of restrictions or limitations on activities." R. at 138. Therefore, according to Dr. Payne, Plaintiff "would be expected to be capable of unrestricted work." Id.

At Plaintiff's request, MetLife provided Dr. Payne's report to Dr. Hill. Dr. Hill submitted an eleven-page response in which he provided a detailed history of Plaintiff's condition and its treatment. He noted that Plaintiff exhibited a "decreased range of motion in his upper back and shoulders, as well as noted tautness in his forearm, shoulder, cervical, and upper back muscles." R. at 151-52. He acknowledged that Plaintiff's "articulated pain would seem, to an untrained person, out of character to these objective physical impairments. However, the perception of pain is subjective, and the fact that Mr. Minton's objective physical impairments seem out of character with his pain, only means that his pain is the result of chronic STP [(soft tissue pain)], rather than from something like a fracture, which can be more easily confirmed through objective tests, like X-rays." R. at 152. He further observed that objective indications of functional limitations of the sort described by Dr. Payne are typically not present in cases of fibromyalgia. Dr. Hill also discussed the medications he had prescribed to ameliorate Plaintiff's pain, including Lexapro, Soma, aspirin, nortriptyline, Cymbalta and vitamin C. He noted that some of these medications had helped "to a limited extent," but they were not sufficient to relieve

5

Plaintiff's pain to the point where he could spend large amounts of time at the computer. R. at 149-50.

Dr. Hill subsequently submitted a report describing a functional capacity test he performed on Plaintiff on January 16, 2008. During the test, Dr. Hill examined Plaintiff before asking him to perform tasks at a computer. After fifty minutes at the computer, Plaintiff stated that his pain had reached a level that prevented him from further computer work. Dr. Hill re-examined Plaintiff and "noted changes in his condition that were positive for aggravation of his pain." R. at 112. Plaintiff exhibited increased tender points throughout his upper back, neck and forearms, decreased range of motion in his neck, muscle stiffness in his forearms, increased muscle turgidity in his upper back and shoulders and increasingly sloped shoulders. Id. In Dr. Hill's opinion, "the changes in [Plaintiff's] body after using the computer objectively prove that computer use causes functional limitations for" him. Id.

Dr. Hill's two reports were provided to Dr. Payne, who reviewed them and submitted a written evaluation to MetLife on January 24, 2009. He wrote:

> [T]he additional information provided in this case represents a further extension of the same somatic signs and symptoms as previously provided. I do not see any objective findings here that would necessitate the placement of restrictions or limitations on activities of any degree. The diagnosis of fibromyalgia is appropriate in this case in that the general classification criteria are seen. In addition, I feel Dr. Hill has performed an exemplary job in evaluation and management of the claimant. However, the issue here is not the diagnosis of fibromyalgia but the impact of fibromyalgia on the person's functionality. There does not exist at this point one observational cohort of patients with

6

>fibromyalgia that have ever been shown to benefit from activity limitation with respect to improvements in functionality, or clinical course, response to treatment, even in a self reporting setting. Further, there does not exist one observational cohort of patients with fibromyalgia that have ever been confirmed to experience progression or development of organic disease of any form as a result of encouragement to normalization of life activities both vocational and avocational. In fact, with placement of restrictions and limitations on activities, persons are compelled to assume a "sick role" with propagation of somatic symptoms and development of affective symptomatology. I have great respect for Dr. Hill and in no way am I making a judgment call on his professional abilities. The medical literature does not have an answer for this question. Further, if a treatment for fibromyalgia (activity limitation) is not efficacious, then abandonment of that mode of treatment (activity limitation) is the proper course. In summary, my opinion in the case does not change.

R. at 99-100.

On February 4, 2008, MetLife informed Plaintiff that it was denying his appeal. In its letter of denial, MetLife discussed the steps it had taken to review Plaintiff's claim. It explained that its denial was based essentially on the reasoning of Dr. Payne that there were no objective medical findings that would support the conclusion that Plaintiff could not perform the duties of his own occupation. R. at 95. Plaintiff now seeks an award of disability benefits under the terms of the Plan.

CONCLUSIONS OF LAW

I.  Standard of Review

Pursuant to Rule 52 of the Federal Rules of Civil Procedure, each of the parties moves for judgment in its favor on Plaintiff's ERISA claim. Under Rule 52, the court conducts what is essentially a bench trial on the record, evaluating the persuasiveness of conflicting testimony and deciding which is more likely true.

7

Kearney v. Standard Ins. Co., 175 F.3d 1084, 1094-95 (9th Cir. 1999).

The standard of review of a plan administrator's denial of ERISA benefits depends upon the terms of the benefit plan. Absent contrary language in the plan, the denial is reviewed de novo. Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989). However, if "the benefit plan expressly gives the plan administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the plan's terms," an abuse of discretion standard is applied. Id. at 102. Under this standard, the administrator's decision will be upheld if is reasonable and supported by substantial evidence in the administrative record as a whole. McKenzie v. General Tel. Co. of Cal., 41 F.3d 1310, 1316-17 (9th Cir. 1994), overruled on other grounds, Saffon v. Wells Fargo & Co. Long Term Disability Plan, 522 F.3d 863, 872 n.2 (9th Cir. 2008).

Here, there is no dispute that the Plan confers discretion upon MetLife. However, in Abatie v. Alta Health & Life Insurance Co., 458 F.3d 955 (9th Cir. 2006) (en banc), the Ninth Circuit held that, in situations where "a plan administrator denies benefits and (1) the wording of the plan confers discretion on the plan administrator and (2) the plan administrator has a conflict of interest," a court should apply an "abuse of discretion review, tempered by skepticism commensurate with the plan administrator's conflict of interest." Id. at 959. To determine the level of skepticism to apply when a conflict exists, a court must consider "all the facts and circumstances." Id. at 968. As the court

8

explained:

> The level of skepticism with which a court views a conflicted administrator's decision may be low if a structural conflict of interest is unaccompanied, for example, by any evidence of malice, of self-dealing, or of a parsimonious claims-granting history. A court may weigh a conflict more heavily if, for example, the administrator provides inconsistent reasons for denial, fails adequately to investigate a claim or ask the plaintiff for necessary evidence, fails to credit a claimant's reliable evidence, or has repeatedly denied benefits to deserving participants by interpreting plan terms incorrectly or by making decisions against the weight of evidence in the record.

Id. at 968-69.  In Metropolitan Life Insurance Co. v. Glenn, ___ U.S. ___, 128 S. Ct. 2343 (2008), the Supreme Court affirmed that a plan fiduciary's conflict of interest should be "weighed as a factor in determining whether there is an abuse of discretion." Id. at 2350 (internal quotation marks omitted).  The framework set out in Glenn is "similar to the one provided in Abatie."  Burke v. Pitney Bowes Inc. Long-Term Disability Plan, 544 F.3d 1016, 1024 (9th Cir. 2008).

    Like the defendant in Abatie, MetLife operates under a structural conflict of interest: it is both the Plan administrator and the funding source for benefits paid under the Plan.  As the Ninth Circuit stated, "such an administrator has an incentive to pay as little in benefits as possible to plan participants because the less money the insurer pays out, the more money it retains in its own coffers."  Id. at 966.  In addition, although MetLife communicated with Plaintiff during the course of its evaluation of his claim, it did not provide Plaintiff with a clear description of the type of additional material or information that was necessary for him to perfect his claim on appeal.  29 C.F.R. § 2560.503-1(g);

1  Saffon, 522 F.3d at 870-72 (9th Cir. 2008).  Considering these
2  facts, the Court will temper its review of MetLife's decision with
3  a moderate amount of skepticism.
4  II.  Plaintiff's Claim for Disability Benefits
5       Pursuant to § 502(a)(1)(B) of ERISA, 29 U.S.C.
6  § 1132(a)(1)(B), Plaintiff seeks disability benefits under the
7  Plan.  This statute allows a participant "to recover benefits due
8  to him under the terms of his plan, to enforce his rights under the
9  terms of the plan, or to clarify his rights to future benefits
10 under the terms of the plan."  Id.
11      Defendant argues that MetLife's decision to deny Plaintiff's
12 claim must be upheld because the decision does not represent an
13 abuse of MetLife's discretion, considering the administrative
14 record as a whole.  Plaintiff argues, to the contrary, that the
15 record clearly demonstrates that he is disabled, and that MetLife's
16 decision was not supported by substantial evidence.
17      MetLife's justification for denying Plaintiff's claim was the
18 lack of objective medical evidence to support the conclusion that
19 Plaintiff was disabled.  But fibromyalgia "is diagnosed entirely on
20 the basis of patients' reports of pain and other symptoms," and
21 "there are no laboratory tests to confirm the diagnosis."  Benecke
22 v. Barnhart, 379 F.3d 587, 590 (9th Cir. 2004).  Dr. Hill informed
23 MetLife of this fact, and Dr. Payne did not dispute it.
24 Nonetheless, MetLife completely discounted the history of
25 Plaintiff's condition, Plaintiff's subjective reports of pain and
26 Dr. Hill's evaluation of Plaintiff's functional capacity.  Instead,
27 it relied exclusively on Dr. Payne's report, even though Dr. Payne

10

had not examined Plaintiff or performed a functional capacity test on him, but instead rendered his opinion based on a lack of evidence that one would not expect to find in the first place. While MetLife need not "accord special weight to the opinions of a claimant's physician," MetLife nonetheless may not "arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician." Black & Decker Disability Plan v. Nord, 538 U.S. 822, 834 (2003). There is nothing in the record to suggest that Dr. Hill's opinion was flawed, and MetLife's failure to credit it was arbitrary under the circumstances.

Moreover, the reasoning in Dr. Payne's January 24, 2008 report reflects a belief that pain that is not supported by objective findings can never be so severe as to interfere with one's ability to function in the workplace. MetLife's embrace of such a view is disapproved by the Ninth Circuit. The appeals court has noted that "individual reactions to pain are subjective and not easily determined by reference to objective measurements." Saffon, 522 F.3d at 872. In Fair v. Bowen, 885 F.2d 597 (9th Cir. 1989), the court stated:

> [D]espite our inability to measure and describe it, pain can have real and severe debilitating effects; it is, without a doubt, capable of entirely precluding a claimant from working. Because pain is a subjective phenomenon, moreover, it is possible to suffer disabling pain even where the degree of pain, as opposed to the mere existence of pain, is unsupported by objective medical findings.

Id. at 601.[3] By "effectively requiring 'objective' evidence for a

---

[3] Although Fair is a Social Security case, the Ninth Circuit has noted that "Social Security precedents are relevant for the
(continued...)

11

disease that eludes such measurement," Benecke, 379 F.3d at 594, MetLife has established a threshold that can never be met by claimants who suffer from fibromyalgia or similar syndromes, no matter how disabling the pain.

The Court concludes that, considering all of the circumstances of this case and evidence in the record, it was an abuse of discretion for MetLife to deny Plaintiff's claim on the sole basis that there was no objective evidence of his limitations, thereby discounting all other evidence in the record and imposing a requirement that Plaintiff could not possibly satisfy.

III. Pre-judgment Interest

A district court may award pre-judgment interest on past-due benefits in ERISA cases. The decision whether to award such interest is "a question of fairness, lying within the court's sound discretion, to be answered by balancing the equities." Landwehr v. DuPree, 72 F.3d 726, 739 (9th Cir. 1995) (quoting Shaw v. Int'l Ass'n of Machinists & Aerospace Workers Pension Plan, 750 F.2d 1458, 1465 (9th Cir. 1985)). The Court finds that the equities support an award of pre-judgment interest in this case.

"Generally, the interest rate prescribed for post-judgment interest under 28 U.S.C. § 1961 is appropriate for fixing the rate of pre-judgment interest . . . ." Blankenship v. Liberty Life

---

[3](...continued)
factual observation that disabling pain cannot always be measured objectively -- which is as true for ERISA beneficiaries as it is for Social Security claimants." Saffon, 522 F.3d at 873 n.3.

12

Assurance Co. of Boston, 486 F.3d 620, 628 (9th Cir. 2007).[4]  This section provides that interest is calculated "at a rate equal to the weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding. [sic] the date of the judgment." In Nelson v. EG & G Energy Measurements Group, Inc., 37 F.3d 1384, 1391 (9th Cir. 1994), the court stated:

> EG & G argues that the pre-judgment interest rate should have been calculated at the 52-week Treasury bill rate[5] as of the time of judgment, which was 3.51 percent.  This does not correspond with the approach taken in Western Pacific Fisheries[, Inc. v. S.S. President Grant, 730 F.2d 1280, 1289 (9th Cir. 1984)].  In that case, insurance underwriters had paid out funds for which they sought reimbursement.  The interest rate utilized for the pre-judgment interest was the average 52-week Treasury bill rate operative immediately prior to the date of payment by the underwriters.  This makes good sense because pre-judgment interest is intended to cover the lost investment potential of funds to which the plaintiff was entitled, from the time of entitlement to the date of judgment.  It is the Treasury bill rate during this interim that is pertinent, not the Treasury bill rate at the time of judgment.  The Treasury bill rate at the time of judgment has no bearing on what could have been earned prior to judgment.
>
> The method of calculating the pre-judgment interest utilized by the district court reasonably reflected this approach.  The interest due was calculated as though the plaintiffs had invested the withheld funds at the 52-week Treasury bill rate and then reinvested the proceeds

---

[4] Plaintiff argues that interest should be calculated at an annual rate of ten percent pursuant to California Insurance Code § 10111.2.  Plaintiff does not explain, however, why a statute governing interest due on claims brought under state law would apply to a federal ERISA claim.

[5] At the time Nelson was decided, 28 U.S.C. § 1961(a) provided that the applicable interest rate was "the coupon issue yield equivalent (as determined by the Secretary of the Treasury) of the average accepted auction price for the last auction of fifty-two week United States Treasury bills settled immediately prior to the date of the judgment."

13

>       annually at the new rate.  This reasonably reflects the
>       conservative investment income the plaintiffs would have
>       been able to have earned had they received the funds on
>       September 30, 1987.

37 F.3d at 1391-92.

Thus, Plaintiff is due interest equivalent to that which would have accrued if he had invested his benefits at a rate equal to the weekly average 1-year constant maturity Treasury yield on the date the benefits were due to him, and then reinvested the proceeds annually at a rate equal to the weekly average 1-year constant maturity Treasury yield at the time of the reinvestment, up to the date on which Defendant satisfies the judgment.

## CONCLUSION

Plaintiff's motion for judgment on the administrative record (Docket No. 17) is GRANTED.  Defendant's cross-motion for judgment on the administrative record (Docket No. 23) is DENIED.  The Court finds that Plaintiff is eligible for long term disability benefits under the "own occupation" standard applicable to the first twenty-four months of benefits, and orders those benefits paid.  Defendant shall also pay pre-judgment interest on these benefits as described above.

MetLife has not yet determined whether Plaintiff has met the higher standard for disability under the "any occupation" standard that applies to benefits after twenty-four months.  Plaintiff's claim for benefits under the "any occupation" standard is therefore remanded to MetLife for further consideration.

MetLife should calculate the amount of past benefits and interest due in the first instance.  After MetLife has made this

14

calculation, the parties shall file a stipulated form of judgment. If a dispute concerning the amount due arises and cannot be resolved without the Court's intervention, the parties may move for appropriate relief.  If Plaintiff seeks an award of attorneys' fees, he must file a separate motion and must support his request with appropriate documentation.

After judgment enters, the case will be closed.  Plaintiff may move to re-open the case if he wishes to challenge MetLife's decision on his claim for benefits under the "any occupation" standard.

IT IS SO ORDERED.

Dated: 6/8/09

CLAUDIA WILKEN
United States District Judge

15